IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GWYNN X KINSEY, JR.<br>210 Grove Blvd<br>Frederick MD 21701, | :<br>:<br>:<br>: | |
| Plaintiff, | :<br>: | |
| v. | :<br>: | Case No:<br>Jury Trial Demanded |
| THE NEW YORK TIMES COMPANY<br>620 Eighth Avenue<br>New York, NY  10018, | :<br>:<br>:<br>: | |
| Defendant. | : | |

## COMPLAINT

1. Plaintiff Gwynn X Kinsey, Jr., sues Defendant The New York Times Company.

2. Gwynn X Kinsey, Jr., known by the nickname "Charlie," is a natural person domiciled in the State of Maryland.

3. The New York Times Company is a corporation domiciled in the State of New York.

4. Jurisdiction exists in this Court because complete diversity exists between the parties, and the amount in controversy exceeds $75,000.

5. Venue exists in this Court because the Defendant is domiciled in this District, and because a substantial part of the acts and omissions complained of herein occurred in this District.

6. From September, 1998 to October, 2017, Mr. Kinsey was an attorney in the Capital Case Section ("CCS"), Criminal Division, United States Department of Justice.  He was promoted to the position of Deputy Chief of the CCS, which was then called the Capital Case Unit, in 2001.  In 2016, he became Principal Deputy Chief of CCS.  On October 31, 2017, he was reassigned to

1

the Office of Enforcement Operations, Criminal Division, following an incident on May 24, 2017, described below.

7. In November 2015, Alyssa tenBroek became employed as an intern in the CCS. Initially, from November 2015 through June 2016, Ms. tenBroek reported to Mr. Kinsey. Subsequently, beginning in July, 2016, Ms. tenBroek reported to another deputy chief of the CCS.

8. On May 24, 2017, a CCS "happy hour" took place at Proper 21, a bar in the District of Columbia. In attendance were Ms. tenBroek, Mr. Kinsey and a number of their CCS colleagues. During the course of this evening, at the bar and elsewhere, interactions of a sexual nature occurred between Mr. Kinsey and Ms. tenBroek.

9. In early March, 2018, Mr. Kinsey's counsel was contacted by Katie Benner, a New York Times reporter. In this respect and in the other respects referenced in this Complaint, Ms. Benner was working within the scope of her employment at the New York Times, was acting as an agent of The New York Times, and The New York Times is liable for her conduct, directly and via the doctrine of *respondeat superior*. A teleconference and subsequent email exchange between Ms. Benner and Mr. Kinsey's counsel ensued. Ms. Benner was overtly angry during her telephone conversation with Mr. Kinsey's counsel. Her email exchange with Mr. Kinsey's counsel is appended as Exhibit 1 and is incorporated by reference into this Complaint. *Inter alia,* Ms. Benner stated as follows, with respect to an investigation of the incident, in an email on March 6, 2018:

> During the course of [its] investigation, the MSPB [United States Merit Systems Protection Board] reviewed tapes of interviews conducted by the OIG [Office of Inspector General] and did its own independent investigation. That process has closed and found that Mr. Kinsey did not act in a way that violated departmental rules (or whatever language you choose here to show that the MSPB exonerated Mr. Kinsey). . . .

> The [New York Times forthcoming] story is not based on a single court filing. I'm sorry that you have that impression. It's based on the case, as well as interviews and other documents. The main allegations, which I've shared with you, are all included in that court filing, so there will be no surprises in the story.

Exhibit 1. Mr. Kinsey's counsel responded later that day:

> ON DEEP BACKGROUND:
>
> Hi Kate – Thanks for your quick response. The language you provided is not entirely accurate, and unfortunately we cannot provide specific corrective information for the reasons I stated. It is, however, the case, as I indicated yesterday on the phone, that information was gathered and a finding made that is inconsistent with the proposition that unwelcome conduct occurred. Under these circumstances, we respectfully submit to you that it would be unfair and inappropriate to include any reference in the article to allegations of improper conduct by Mr. Kinsey. Best regards, Barry

*Id.*

     10.    In or around March 31, 2018, Defendant The New York Times published to third persons, in print and online, with Ms. Benner's byline, an article entitled: "At the Justice Dept's Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping." Copies of this article are appended here as Exhibits 2 and 3 and are incorporated into this complaint by reference. Much of the article focused upon Kevin Carwile, the then-Chief of the CCS. However, a substantial portion of the article related directly to Mr. Kinsey. A picture of Mr. Kinsey appeared in the print version of the article, accompanied by the caption, "Gwynn Kinsey was Mr. Carwile's deputy in the division." Most significantly for purposes of this complaint, the article references a declaration from a former CCS colleague, Luke Woolman, which had been filed in a civil case in the United States District Court for the District of Connecticut, and states:

> The years of warnings that their bosses had ignored or condoned misconduct came to a head last May. During a work-sanctioned happy hour at a restaurant near the Justice Department, colleagues watched Mr. Kinsey grope the administrative assistant, Alyssa tenBroek.

> "Mr. Kinsey, who is a married man, began to take what seemed very clearly to be unwelcome liberties of a physical, sexual nature," Luke Woolman, an intern at the time, wrote in his declaration.  He said Mr. Kinsey repeatedly touched Ms. tenBroek, whom he identified as A.T., "inappropriately, openly and obviously" in front of patrons, Mr. Carwile and at least one other Justice Department prosecutor.
>
> . . . .
>
> The department's inspector general began investigating, and Mr. Kinsey was demoted and moved to another division.  He is appealing.  A person close to Mr. Kinsey said that evidence in another investigation is favorable to him, but would not say who was conducting that inquiry.

11. The assertion of purported fact in the New York Times article of March 31, 2018, quoted above, to the effect that Mr. Kinsey's touching of Ms. tenBroek was "unwelcome," is false and defamatory *per se*.  Without conceding that Mr. Kinsey is a public figure or a public official – we contend that he is neither a public figure nor a public official -- it is asserted here that The New York Times' publication of this assertion was either knowingly false or reckless, and reflected actual malice.  In particular, Mr. Woolman's declaration, appended here as Exhibit 4, states:

> Investigations were conducted regarding this incident, and I was interviewed by James Mann, Chief of Staff to then-Assistant Attorney General Leslie Caldwell.  During the course of my interview with Mr. Mann, another person was on the telephone listening.  I was also interviewed by investigators from the Department of Justice, Office of the Inspector General.

*Id.* at Paragraph 9.  Examination of these materials referenced in the Woolman declaration would have demonstrated the falsity of the assertion that Mr. Kinsey's touching of Ms. tenBroek was unwelcome.  Particularly given the information we proffered to Ms. Benner in Exhibit 1, it was both reckless and malicious, and constituted deliberate avoidance of the truth, for The New York Times to publish the assertion of fact that Mr. Kinsey's touching of Ms. tenBroek was unwelcome, without reviewing and taking account of the materials relating to the Department of

Justice investigations expressly referenced by Mr. Woolman.  Accordingly, the New York Times was aware of the existence of documents which, had they been reviewed, would have provided information that was directly inconsistent with Mr. Woolman's assertion that the touching in question was unwelcome.  However, the Defendant deliberately and recklessly published this assertion without obtaining or seeking to obtain, review, or reference in this article this available directly contrary information.

12. In particular, malice is demonstrated by the following factors:

(a) The article reflects a preconceived narrative formulated by Ms. Benner, arising from, *inter alia,* her prior reporting on sexual misconduct in Silicon Valley, California. This preconceived narrative was reflected, *inter alia,* in a statement made on November 9, 2017, by Ms. Benner, during a "TimesTalk" program in New York City.  Recounting her reporting concerning sexual harassment in Silicon Valley, Ms. Benner stated:  "Right now, the system is set up to protect a man's right to make money over a woman's right to live her life and have a job. . . .  That's the power difference. . . that's what we're fighting, and that's what we're trying to uncover."  This preconceived narrative was demonstrated by Ms. Benner's anger during the telephone conference referenced above, and evident hostility towards Mr. Kinsey, when confronted by facts inconsistent with her preferred narrative.

(b) The New York Times failed adequately to investigate the above-referenced interactions between Mr. Kinsey and Ms. tenBroek, and, in so doing, failed to adhere to applicable journalistic standards.  Had such an investigation been undertaken, it would have demonstrated that the declaration from Mr. Woolman upon which The New York Times relied contained a number of inaccuracies and inappropriate content.  The

declaration failed to contain an actual signature and notarization, as required by the Local Rules for the United States District Court for the District of Connecticut, where it was filed.  *See* Exhibit 5 at 54.  Further, it failed to comply with the requirements for such sworn declarations mandated by 28 U.S.C. § 1746(2).  And it stated that Mr. Woolman was "currently a second-year law student at the University of Cincinnati College of Law," whereas in fact, at the time the declaration was filed, on December 23, 2017, Mr. Woolman was a third-year law student.  *See* Exhibit 6, Commencement Program, University of Cincinnati, 2018, at 33.  Thus, the Woolman Declaration was a patently unreliable source, particularly given the information Mr. Kinsey's counsel had proffered to Ms. Benner.  The New York Times nonetheless printed its contents, as described above, without adequately confirming its purported assertion that the contact between Mr. Kinsey and Ms. tenBroek had been unwelcome.

(c)     The Woolman Declaration expressly references other individuals with knowledge of the above-described incident on May 24, 2017, and of Mr. Woolman's observations concerning it.  In particular, the Woolman Declaration references Kevin Carwile, and "A.T." (Ms. tenBroek).  Further, it makes express reference to an interview of Mr. Woolman by James Mann, Chief of Staff to the then-Acting Assistant Attorney General of the Criminal Division of the Department of Justice, as well as another person who listened to this interview, and to an interview of Mr. Woolman conducted by investigators from the Office of the Inspector General of the Department of Justice.  Further, The New York Times article of March 31, 2018 (Exhibits 2 and 3) references, *e.g.,* then-CCS employees Amanda Haynes, Sonia Jimenez and Julie Mosley.  Had the New York Times pursued an adequate investigation before defaming Mr. Kinsey, it

would have learned that Mr. Woolman had made statements directly and irreconcilably inconsistent with the proposition that Mr. Kinsey's conduct towards Ms. tenBroek at the bar had appeared to be "unwelcome."

13.     As a direct and proximate result of the defamatory conduct alleged here, Mr. Kinsey was substantially and irreparably damaged.  Damages are in excess of $75.000.  This damage includes but it not limited to damage to his reputation.  Accordingly, it is respectfully submitted that judgment should be ordered against the Defendant for an amount adequate to compensate the Plaintiff for these damages, as well as post-judgment interest, costs, and any other award of damages the Court deems appropriate.  A jury trial is respectfully sought as to each and every allegation in this Complaint that is triable by a jury.

                                        Respectfully submitted,


                                        /s/ Barry Coburn
                                        _____
                                        Barry Coburn
                                        Bar Pers. Identifier:  bqc1981
                                        Coburn& Greenbaum PLLC
                                        1710 Rhode Island Avenue, NW
                                        Second Floor
                                        Washington, DC  20036
                                        Tel:  202-643-9472
                                        Email:  barry@coburngreenbaum.com
                                        Fax:  866-561-9712