5/18/2018 At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping - The New York Times

Case 1:18-cv-12345-VSB   Document 2-2   Filed 01/02/19   Page 1 of 8

# The New York Times

# At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping

By Katie Benner

March 31, 2018

WASHINGTON — When Kevin Carwile arrived to run the Justice Department's death penalty unit in 2010, he had never prosecuted or sat through an entire capital punishment case. He was moved into the job after overseeing the gangs unit, and some prosecutors worried he lacked the expertise to steer the division.

Now Mr. Carwile has been removed from his post after The New York Times inquired about a series of grievances against him, including complaints that he promoted gender bias and a "sexualized environment." He fostered a culture of favoritism and sexism, according to court records, internal documents and interviews with more than a half-dozen current and former employees. In one episode, his deputy groped an administrative assistant at a bar in view of their colleagues, according to some who were present. Mr. Carwile asked the witnesses to keep it secret, one said.

Employees of the unit, the capital case section, complained about the issues to Justice Department officials, the inspector general and the Equal Employment Opportunity Commission at least 12 times. Some allegations went unaddressed for years. In cases that were investigated, the accusers were never told what investigators found. Both Mr. Carwile and his deputy, Gwynn Kinsey, remained Justice Department employees despite the inquiries.

5/18/2018  At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping - The New York Times

Case 1:18-cv-12345-VSB   Document 2-2   Filed 01/02/19   Page 2 of 8



Gwynn Kinsey was Mr. Carwile's deputy in the division.

Six employees, including the administrative assistant, said they eventually left the section or quit government altogether in part because of the toxic climate. A defendant in Indiana has asked in court for the government to drop the death penalty recommendation in his case because of the unit's emerging conduct issues.

Mr. Carwile declined to comment. After The Times contacted the Justice Department for this article, he was demoted and detailed to a different division. Through his lawyers, Mr. Kinsey declined to comment.

"The Department of Justice takes these allegations extremely seriously but cannot discuss specific employee disciplinary actions, or comment on internally handled personnel actions or matters that may impact personal privacy," said Ian Prior, a Justice Department spokesman. The department confirmed that it referred some allegations made by employees to the inspector general, whose spokesman would not confirm or deny any investigation.

The unit is poised to gain power. President Trump has suggested the United States start executing drug dealers, and Attorney General Jeff Sessions has urged prosecutors to seek the death penalty whenever possible in drug-related crimes.

## A Mercurial Boss

The Justice Department created the capital case section in 1998 to help the attorney general decide when to apply capital punishment. The section's prosecutors advise or work with trial teams on cases and a few trials a year. They were involved in some high-profile prosecutions like those of Dzhokhar Tsarnaev, one of the Boston Marathon bombers, and Dylann S. Roof, who was convicted in 2016 of murdering nine people at an African-American church in South Carolina.

5/18/2018                               At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping - The New York Times

Case 1:18-cv-12345-VSB   Document 2-2   Filed 01/02/19   Page 3 of 8

As the death penalty fell out of favor in the United States, the influence of the unit, already one of the smallest in the Justice Department, waned. About half a dozen trial lawyers worked there in the beginning of 2012, along with a lawyer conducting protocol reviews and three others on loan from different parts of the department.

Mr. Carwile had arrived just before the public learned of the Fast and Furious scandal, a botched operation in which agents at the Bureau of Alcohol, Tobacco, Firearms and Explosives let criminals move guns across the border into Mexico to try to build a bigger case. Many of the firearms were later found at crime scenes. Mr. Carwile incorrectly told superiors that the A.T.F. learned about guns moving illegally only after the fact, according to a subsequent inspector general investigation. He was moved from his post as head of the gangs unit to the much smaller capital punishment division.



Kevin Carwile arrived to run the Justice Department's death penalty division in 2010.

He quickly gained a reputation as a mercurial manager with a hands-off style that bordered on neglect, according to current and former employees. He rarely responded to emails, four former employees said, and in meetings his questions revealed that he had not read their messages.

But after his first year, Mr. Carwile received the Excellence in Management award for the criminal division as the section's lawyers prosecuted more cases.

In 2013, Jacabed Rodriguez-Coss, a prosecutor who had herself won one of the department's highest awards, complained to human resources that Mr. Carwile expected her to involuntarily travel far more than her male counterparts.

5/18/2018 At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping - The New York Times

Case 1:18-cv-12345-VSB   Document 2-2   Filed 01/02/19   Page 4 of 8

Though she lived in Connecticut and had cases in Rhode Island and Vermont, he assigned her to one in California. She protested that her family needed her nearby. Her husband, an F.B.I. agent, was one of the first on the scene of the shooting at Sandy Hook Elementary School and was confronting the aftermath of having worked on the case.

Ms. Rodriguez-Coss filed a complaint to the E.E.O.C., which notified the Justice Department. Mr. Carwile subsequently suspended permission for her to work from Connecticut. She sued the department in 2016, accusing him of gender discrimination and claiming that her permission to work in Connecticut was taken away in retaliation for her complaints.

Seven men and women from the unit filed declarations in her support. Two male colleagues said that they had not been assigned so much travel. Bruce R. Hegyi, a former prosecutor, wrote that he left because of "plainly unethical and improper conduct."

He said in his filing that Mr. Carwile promoted "a sexualized environment," took him to a restaurant with scantily clad waitresses and let a fellow prosecutor show naked photographs of a woman during a work gathering of both men and women.

Other employees said in their declarations that Mr. Carwile held men-only meetings, sent emails only to men and assigned more desirable and high-profile cases to men. "Women only go to law school to find rich husbands," he said, according to a declaration filed by one lawyer, Amanda Haines.

Under Mr. Carwile, there was incentive "not to stir things up," said Kevin Little, the lawyer representing Ms. Rodriguez-Coss.

"My client and other of her colleagues feared retaliation," he said.

The Justice Department said in its response that Ms. Rodriguez-Coss's claims "boil down to her admitted refusal to perform the essential requirements of her position," which included taking on cases that required travel.

## Life-or-Death Cases in the Balance

Around the same time, Ms. Haines, who worked as a federal prosecutor for 18 years before joining the division, alerted Mr. Carwile to persistent work-quality issues, warnings that she later described in a court filing.

In one case in Pennsylvania, she said, she received no files describing the government's work by the previous prosecutor, despite numerous requests, and dozens of boxes with discovery materials had sat unreviewed.

She told Mr. Carwile and Mr. Kinsey, but the problem went unaddressed. Her colleague instead received a plum assignment: the Boston Marathon bombing trial.

In the Indiana case, Ms. Haines said her predecessor interviewed over a dozen witnesses without a law enforcement officer or other witness present, an error that could jeopardize the government's work. She said in a legal filing that the prosecutor, who later won a departmental award, destroyed his interview notes, which he initially denied but later acknowledged.

After Ms. Haines took her concerns to Mr. Carwile, a colleague shared them in an email with Sung-Hee Suh, then the deputy assistant attorney general.

Ms. Haines also described the errors in a declaration filed in Ms. Rodriguez-Coss's lawsuit. After her accusations became public, defense lawyers in the Indiana case pushed back on the government's recommendation to seek the death penalty for their client, Andrew Rogers, a felon accused of tying up his cellmate and stabbing him to death.

The notes the prosecutor is accused of destroying could have been the difference "between a verdict for life and a verdict for death," the defense wrote in a brief in January.

"If you pull on the thread, who knows how many cases could be impacted?" said Mr. Little, Ms. Rodriguez-Coss's lawyer.

> It is shocking that prosecutors in the section dedicated solely to capital cases would be so cavalier in regard to a defendant's life—and would be so cavalier in direct contradiction to DOJ policies and Supreme Court precedent. DOJ policies formulated in

A portion of a brief filed by defense lawyers for Andrew Rogers, a felon accused of tying up his cellmate and stabbing him to death.

## 'Unwelcome Liberties'

Two years ago, another prosecutor in the section, Ann Carroll, was asked to travel for work after she had surgery. Around that time, she learned that a male colleague was allowed to forgo travel to accommodate his gluten intolerance.

"Over the 20 years I had worked at the Department of Justice, I had never experienced a complete lack of sensitivity in the immediate aftermath of a serious medical illness," Ms. Carroll wrote in a declaration. "I felt Mr. Carwile's response was arbitrary, and gender-based." She quit that June.

5/18/2018 At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping - The New York Times

Case 1:18-cv-12345-VSB   Document 2-2   Filed 01/02/19   Page 6 of 8

Before departing, Ms. Carroll said she described ethical violations to Ms. Suh, prompting a management review. Four former and current employees said in court declarations and to The Times that they told Ms. Suh and James Mann, the chief of staff to the head of the Criminal Division at the Justice Department, about the mishandled cases, sexualized culture and gender bias.

Ms. Suh ultimately said that Mr. Carwile and Mr. Kinsey, as a result of the review, were "now doing their best," according to Mr. Hegyi's declaration, and she concluded that employees were unhappy because they wanted to work from home, to choose between trials and case reviews, and to be given more ways to bring concerns to management.

Her conclusions dumbfounded employees who said they had shared more serious grievances. A person briefed on the matter said they were not told of steps being taken to address complaints because those were confidential.

Ms. Suh, who now works at the asset manager Pimco, said she could not comment on the details of pending litigation or personnel matters. "Any allegations of misconduct, discrimination, harassment or bias actually brought to my attention were fully and fairly investigated and addressed appropriately," she said.

The years of warnings that their bosses had ignored or condoned misconduct came to a head last May. During a work-sanctioned happy hour at a restaurant near the Justice Department, colleagues watched Mr. Kinsey grope the administrative assistant, Alyssa tenBroek.

"Mr. Kinsey, who is a married man, began to take what seemed very clearly to be unwelcome liberties of a physical, sexual nature," Luke Woolman, an intern at the time, wrote in his declaration. He said Mr. Kinsey repeatedly touched Ms. tenBroek, whom he identified as A.T., "inappropriately, openly and obviously" in front of patrons, Mr. Carwile and at least one other Justice Department prosecutor.

Mr. Woolman and the prosecutor, Sonia Jimenez, suggested everyone go home, he later told Ms. Haines. Ms. Jimenez tried to discourage Mr. Kinsey from trying to persuade Ms. tenBroek to go to a hotel with him, according to an internal memo by Ms. Haines.

5/18/2018 At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping - The New York Times

Case 1:18-cv-12345-VSB   Document 2-2   Filed 01/02/19   Page 7 of 8

A portion of the declaration by Luke Woolman, an intern at the time in the death penalty division.

As the night wound down, Mr. Carwile pulled aside Mr. Woolman and asked him not to tell anyone what he had seen.

"He sternly reiterated his request, specifically stating that he was being serious," Mr. Woolman wrote.

## Fallout From a Night Out

After that night, tensions in the unit exploded into view. Ms. tenBroek showed colleagues text messages from Mr. Kinsey in which he offered to give her money, pay her bills or take her on a trip. He also sent her photos of herself that he had downloaded from the internet.

He signed off "XOXOXOX," according to Ms. Haines's memo. In other messages, he appeared to apologize.

Ms. tenBroek later told Ms. Haines and Julie Mosley, another prosecutor, that Mr. Kinsey groped her again in the cab and tried to coerce her into checking into a hotel.

Ms. Mosley told the E.E.O.C., and Ms. Haines sent her memo to superiors at the Justice Department. "I trust you will give this matter the serious attention it deserves," she wrote. Mr. Woolman said in a court filing that he shared his story with Mr. Mann and an investigator from the inspector general's office.

Ms. tenBroek did not dispute her co-workers' accounts and said in a statement that she had participated in the department's "lengthy and taxing" complaint process. She has since left the agency.

"I have always wanted to pursue a career with the Department of Justice, but it failed me when I reported misconduct," she said. "No woman should feel compelled to deal with the pervasive harassment that I experienced, much less have her complaint be effectively disregarded."

5/18/2018 At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping - The New York Times

Case 1:18-cv-12345-VSB   Document 2-2   Filed 01/02/19   Page 8 of 8

The department's inspector general began investigating, and Mr. Kinsey was demoted and moved to another division. He is appealing. A person close to Mr. Kinsey said that evidence in another investigation is favorable to him, but would not say who was conducting that inquiry.

Current and former employees said the public understandably expects death penalty cases to be handled with integrity. As Mr. Sessions and Mr. Trump push for more capital punishments, the section's history, they say, could work against the Justice Department.

The same month as the happy hour, the inspector general, Michael E. Horowitz, sent a memo to Rod J. Rosenstein, the deputy attorney general. Sexual harassment, he wrote, "profoundly affects the victim and affects the agency's reputation, undermines the agency's credibility, and lowers employee productivity and morale."

Doris Burke and Kitty Bennett contributed research.

*Get politics and Washington news updates via Facebook, Twitter and the Morning Briefing newsletter.*

A version of this article appears in print on April 1, 2018, on Page A1 of the New York edition with the headline: Years of Claims Of Harassment In Justice Dept.