IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GWYNN X. KINSEY, JR. | : | |
| 210 Grove Blvd | : | |
| Frederick MD 21701, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No: 1:18-cv-12345-VSB |
| | : | Jury Trial Demanded |
| THE NEW YORK TIMES COMPANY | : | |
| 620 Eighth Avenue | : | |
| New York, NY  10018, | : | |
| | : | |
| Defendant. | : | |

**FIRST AMENDED COMPLAINT**

1. Plaintiff Gwynn X. Kinsey, Jr., sues Defendant The New York Times Company.

2. Gwynn X. Kinsey, Jr., known by the nickname "Charlie," is a natural person domiciled in the State of Maryland.

3. The New York Times Company is a corporation domiciled in the State of New York.

4. Jurisdiction exists in this Court because complete diversity exists between the parties, and the amount in controversy exceeds $75,000.

5. Venue exists in this Court because the Defendant is domiciled in this District, and because a substantial part of the acts and omissions complained of herein occurred in this District.

Introduction

6. This lawsuit is filed for two principal reasons:  First, the defamatory falsehood in question is the contention, in the "Woolman Declaration" referenced below, that the physical contact between Mr. Kinsey and the younger individual in question was "unwelcome."  In its

1

opposition to our initial Complaint, the New York Times suggests that this assertion is insignificant, given that Mr. Kinsey did have sexual contact with a younger person in his section at the United States Department of Justice. In fact, the assertion that this contact was unwelcome, rather than consensual, is of substantial legal and reputational significance.

7. Second, there existed express, unambiguous, specific evidence in the record that refuted the contention in the Woolman Declaration that the contact between Mr. Kinsey and the other individual was unwelcome. In fact, this evidence directly refuted the assertion that *Mr. Woolman contended* that the contact was unwelcome. As alleged below, Mr. Kinsey's counsel sought, within the bounds of permissible press contact in this context, to send a clear signal to the reporter that this evidence existed. The reporter was in direct contact with individuals from Mr. Kinsey's section at the Department of Justice. However, the record indicates that no effort was made – via the Freedom of Information Act or otherwise – to obtain this contrary information. Rather, the Defendant went to press – in at least three versions of this front-page story, published in every state of the United States and all over the world – with the republished, defamatory assertion that the contact in question was unwelcome. This, we respectfully submit, along with the other factors cited here, constitutes a showing of malice sufficient to permit this lawsuit to proceed into discovery. We of course acknowledge the existence of the Fair Report Privilege, codified in the State of New York at Civil Rights Act §74, though we do not concede its application here. It will be our contention that choice of law principles require application of law concerning the version of this privilege in effect in the District of Columbia rather than New York. In either jurisdiction, however, this privilege is overcome by a showing of malice.

2

Facts

8.   From September, 1998 to October, 2017, Mr. Kinsey was an attorney in the Capital Case Section ("CCS"), Criminal Division, United States Department of Justice.  He was promoted to the position of Deputy Chief of the CCS, which was then called the Capital Case Unit, in 2001.  In 2016, he became Principal Deputy Chief of CCS.  On October 31, 2017, he was reassigned to the Office of Enforcement Operations, Criminal Division, following an incident on May 24, 2017, described below.  At no time referenced in this Complaint did Mr. Kinsey formulate agency policy, engage with the public or the press, or otherwise assume the risk of negative press coverage.  Nor did he render decisions or make recommendations as to whether the Department of Justice should seek the death penalty in particular criminal cases.  His office was, and is, in the District of Columbia, as are the offices of the CCS.

9.   In November 2015, Alyssa tenBroek became employed as an intern in the CCS.  Initially, from November 2015 through June 2016, Ms. tenBroek reported to Mr. Kinsey.  Subsequently, beginning in July, 2016, Ms. tenBroek reported to another deputy chief of the CCS.

10. On May 24, 2017, a CCS "happy hour" took place at Proper 21, a bar in the District of Columbia.  In attendance were Ms. tenBroek, Mr. Kinsey and a number of their CCS colleagues.  During the course of this evening, at the bar and elsewhere, interactions of a sexual nature occurred between Mr. Kinsey and Ms. tenBroek.

11. In early March, 2018, Mr. Kinsey's counsel was contacted by Katie Benner, a New York Times reporter.  In this respect and in the other respects referenced in this Complaint, Ms. Benner was working within the scope of her employment at the New York Times, was acting as an agent of The New York Times, and The New York Times is liable for her conduct, directly and via the doctrine of *respondeat superior*.  A teleconference and subsequent email exchange

Formatted: Bullets and Numbering

between Ms. Benner and Mr. Kinsey's counsel ensued. Ms. Benner was overtly angry during her telephone conversation with Mr. Kinsey's counsel. Her email exchange with Mr. Kinsey's counsel is appended as Exhibit 1 and is incorporated by reference into this Complaint. *Inter alia,* Ms. Benner stated as follows, with respect to an investigation of the incident, in an email on March 6, 2018:

> During the course of [its] investigation, the MSPB [United States Merit Systems Protection Board] reviewed tapes of interviews conducted by the OIG [Office of Inspector General] and did its own independent investigation. That process has closed and found that Mr. Kinsey did not act in a way that violated departmental rules (or whatever language you choose here to show that the MSPB exonerated Mr. Kinsey). . . .
>
> The [New York Times forthcoming] story is not based on a single court filing. I'm sorry that you have that impression. It's based on the case, as well as interviews and other documents. The main allegations, which I've shared with you, are all included in that court filing, so there will be no surprises in the story.

Exhibit 1. Mr. Kinsey's counsel responded later that day:

> ON DEEP BACKGROUND:
>
> Hi Kate – Thanks for your quick response. The language you provided is not entirely accurate, and unfortunately we cannot provide specific corrective information for the reasons I stated. It is, however, the case, as I indicated yesterday on the phone, that information was gathered and a finding made that is inconsistent with the proposition that unwelcome conduct occurred. Under these circumstances, we respectfully submit to you that it would be unfair and inappropriate to include any reference in the article to allegations of improper conduct by Mr. Kinsey. Best regards, Barry

*Id.*

12.     In or around March 31, 2018, Defendant The New York Times published to third persons, in print and online, with Ms. Benner's byline, an article entitled: "At the Justice Dept's Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping." Copies of this article are appended here as Exhibits 2, 3 and 4 and are incorporated into this complaint by reference. Much of the article focused upon Kevin Carwile, the then-Chief of the CCS.

However, a substantial portion of the article related directly to Mr. Kinsey. A picture of Mr. Kinsey appeared in the print version of the article, accompanied by the caption, "Gwynn Kinsey was Mr. Carwile's deputy in the division." Most significantly for purposes of this complaint, the article references a declaration from a former CCS colleague, Luke Woolman, which had been filed in a civil case in the United States District Court for the District of Connecticut, and states:

> The years of warnings that their bosses had ignored or condoned misconduct came to a head last May. During a work-sanctioned happy hour at a restaurant near the Justice Department, colleagues watched Mr. Kinsey grope the administrative assistant, Alyssa tenBroek.
>
> "Mr. Kinsey, who is a married man, began to take what seemed very clearly to be unwelcome liberties of a physical, sexual nature," Luke Woolman, an intern at the time, wrote in his declaration. He said Mr. Kinsey repeatedly touched Ms. tenBroek, whom he identified as A.T., "inappropriately, openly and obviously" in front of patrons, Mr. Carwile and at least one other Justice Department prosecutor.
>
> . . . .
>
> The department's inspector general began investigating, and Mr. Kinsey was demoted and moved to another division. He is appealing. A person close to Mr. Kinsey said that evidence in another investigation is favorable to him, but would not say who was conducting that inquiry.

13. The assertion of purported fact in the New York Times article of March 31, 2018, quoted above, to the effect that Mr. Kinsey's touching of Ms. tenBroek was "unwelcome," is false and defamatory *per se*. Without conceding that Mr. Kinsey is a public figure or a public official – we contend that he is neither a public figure nor a public official -- it is asserted here that The New York Times' publication of this assertion was either knowingly false or reckless, and reflected actual malice. In particular, Mr. Woolman's declaration, appended here as Exhibit 5, states:

> Investigations were conducted regarding this incident, and I was interviewed by James Mann, Chief of Staff to then-Assistant Attorney General Leslie Caldwell. During the course of my interview with Mr. Mann, another person was on the

5

>   telephone listening.  I was also interviewed by investigators from the Department of Justice, Office of the Inspector General.

*Id.* at Paragraph 9.  Examination of these materials referenced in the Woolman declaration would have demonstrated the falsity of the assertion that Mr. Kinsey's touching of Ms. tenBroek was unwelcome.  Particularly given the information we proffered to Ms. Benner in Exhibit 1, it was both reckless and malicious, and constituted deliberate avoidance of the truth, for The New York Times to publish the assertion of fact that Mr. Kinsey's touching of Ms. tenBroek was unwelcome, without reviewing and taking account of the materials relating to the Department of Justice investigations expressly referenced by Mr. Woolman.  Accordingly, the New York Times was aware of the existence of documents which, had they been reviewed, would have provided information that was directly inconsistent with Mr. Woolman's assertion that the touching in question was unwelcome.  However, the Defendant deliberately and recklessly published this assertion, in disregard for the truth, without obtaining or seeking to obtain, review, or reference in this article this available directly contrary information.

    14.    The references in the New York Times article to the Woolman Declaration do not make clear in what proceeding it was filed, nor that it was filed, nor its significance in the context of any such judicial proceeding.  This renders the Fair Report Privilege inapplicable.

    15.    Malice, including reckless disregard for the truth and accuracy of the story in question, and reckless disregard for the falsity of the allegation in the Woolman declaration as to "unwelcome" conduct, is demonstrated by the following factors, which, we respectfully submit, should be analyzed together to determine whether they constitute a sufficient showing of malice:

    (a)    The article reflects a preconceived narrative formulated by Ms. Benner, arising from, *inter alia,* her prior reporting on sexual misconduct in Silicon Valley, California.  This preconceived narrative was reflected, *inter alia,* in a statement made on November

9, 2017, by Ms. Benner, during a "TimesTalk" program in New York City.  Recounting her reporting concerning sexual harassment in Silicon Valley, Ms. Benner stated: "Right now, the system is set up to protect a man's right to make money over a woman's right to live her life and have a job. . . .  That's the power difference. . . that's what we're fighting, and that's what we're trying to uncover."  This preconceived narrative was demonstrated by Ms. Benner's anger during the telephone conference referenced above, and evident hostility and ill-will towards Mr. Kinsey, when confronted by facts inconsistent with her preferred narrative.

(b)     The New York Times failed adequately to investigate the above-referenced interactions between Mr. Kinsey and Ms. tenBroek, and, in so doing, failed to adhere to applicable journalistic standards.  This failure to investigate constituted a purposeful avoidance of the truth.  Had such an investigation been undertaken, it would have demonstrated that the declaration from Mr. Woolman upon which The New York Times relied contained a number of inaccuracies and inappropriate content.  The declaration failed appropriately to comply with the requirements for such sworn declarations mandated by 28 U.S.C. § 1746(2).  And it stated that Mr. Woolman was "currently a second-year law student at the University of Cincinnati College of Law," whereas in fact, at the time the declaration was filed, on December 23, 2017, accordingly to publicly available information, Mr. Woolman was a third-year law student.  *See* Exhibit 6, Commencement Program, University of Cincinnati, 2018, at 33.  Thus, the Woolman Declaration was a patently unreliable source, particularly given the information Mr. Kinsey's counsel had proffered to Ms. Benner.  No information corroborating the assertion of unwelcome contact was in the possession of the New York Times.  The New

> **Deleted:** to contain an actual signature and notarization, as required by the Local Rules for the United States District Court for the District of Connecticut, where it was filed.  *See* Exhibit 5 at 54.  Further, it failed

7

York Times nonetheless printed its contents, as described above, without adequately confirming its purported assertion that the contact between Mr. Kinsey and Ms. tenBroek had been unwelcome.

(c)     The Woolman Declaration expressly references other individuals with knowledge of the above-described incident on May 24, 2017, and of Mr. Woolman's observations concerning it.  In particular, the Woolman Declaration references Kevin Carwile, and "A.T." (Ms. tenBroek).  Further, it makes express reference to an interview of Mr. Woolman by James Mann, Chief of Staff to the then-Acting Assistant Attorney General of the Criminal Division of the Department of Justice, as well as another person who listened to this interview, and to an interview of Mr. Woolman conducted by investigators from the Office of the Inspector General of the Department of Justice.  Further, The New York Times article of March 31, 2018 (Exhibits 2, 3 and 4) references, *e.g.,* then-CCS employees Amanda Haynes, Sonia Jimenez and Julie Mosley.  Ms. Benner was in contact with some or all of these individuals.  Had the New York Times pursued an adequate investigation before defaming Mr. Kinsey, it would have learned that Mr. Woolman had made statements directly and irreconcilably inconsistent with the proposition that Mr. Kinsey's conduct towards Ms. tenBroek at the bar had appeared to be "unwelcome."

(d)     Mr. Kinsey's counsel, during his conversation with Ms. Benner referenced above, sought to signal her, on "deep background," concerning the existence of this evidence.  Employees of the Department of Justice are constrained in terms of their permissible contact with the press.  Mr. Kinsey's counsel was trying to ensure that Mr. Kinsey could not be accused of violating any such rules, while at the same time letting the New York

8

Times know that evidence existed that would directly contradict an assertion by Mr. Woolman that the contact in question was unwelcome.  On information and belief, this information would have been available to the New York Times, had it conducted an adequate investigation.  The article in question, as well as Mr. Kinsey's contact with Ms. Benner, leaves no doubt that the New York Times knew that this investigative record existed.  In fact, Ms. Benner expressly referenced the Merit Systems Protection Board proceeding – which, in fact, never reached any conclusion in Mr. Kinsey's case – during her contacts with Mr. Kinsey's counsel.  However, on information and belief, the New York Times made no attempt to obtain the underlying investigative record, via a Freedom of Information Act request or otherwise.  This investigative record was, at the time the New York Times contacted Mr. Kinsey's counsel and at the time the article was published, in the possession of the United States Department of Justice Office of Attorney Recruitment and Management ("OARM"), as well as the United States Merit Systems Protection Board.  On information and belief, this information could have been obtained via a Freedom of Information Act request.  Had the New York Times obtained it or otherwise learned of its contents, the investigative record would have directly refuted the proposition that Mr. Woolman's observation was that the contact in question was unwelcome.

(e)   Even to this date, the New York Times has shown no willingness to retract the assertion that the contact in question was unwelcome.

16.   As a direct and proximate result of the defamatory conduct alleged here, Mr. Kinsey was substantially and irreparably damaged.  Damages are in excess of $75,000.  This damage includes but is not limited to damage to his reputation.  Accordingly, it is respectfully

submitted that judgment should be ordered against the Defendant for an amount adequate to compensate the Plaintiff for these damages, as well as post-judgment interest, costs, and any other award of damages the Court deems appropriate.  A jury trial is respectfully sought as to each and every allegation in this Complaint that is triable by a jury.  A redline comparison between this First Amended Complaint and the original Complaint is appended as Exhibit 7.

                          Respectfully submitted,

                          /s/ Barry Coburn

                          _____
                          Barry Coburn
                          Bar Pers. Identifier:  bqc1981
                          Coburn& Greenbaum PLLC
                          1710 Rhode Island Avenue, NW
                          Second Floor
                          Washington, DC  20036
                          Tel:  202-643-9472
                          Email:  barry@coburngreenbaum.com   [Field Code Changed]
                          Fax:  866-561-9712

Certificate of Service

I hereby certify that on February 28. 2019, a true copy of this First Amended Complaint was served upon the Defendant via this Court's electronic filing system.

/s/ Barry Coburn