UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x
                                :
GWYNN X. KINSEY, JR.,              :
                                :
                    Plaintiff,   :
                                :
     - against -                 :    No. 1:18-cv-12345-VSB
                                :
THE NEW YORK TIMES COMPANY,  :
                                :
                    Defendant.  :
                                :
——————————————————————x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION
TO DISMISS AMENDED COMPLAINT BY DEFENDANT
<u>THE NEW YORK TIMES COMPANY</u>**

David E. McCraw, Esq.
Al-Amyn Sumar, Esq.
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-4031
Fax: (212) 556-4634
Email: mccraw@nytimes.com

*Attorneys for Defendant*
*The New York Times Company*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

  I. THE FAIR REPORT PRIVILEGE DEFEATS MR. KINSEY'S LIBEL CLAIM .................. 2

    A.  New York Law Provides an Absolute Privilege to The Times ........................................ 2

    B.  New York Law Applies to the Issue of Privilege ............................................................ 3

    C.  The Complaint Would Merit Dismissal Even if New York Law Did Not Apply ............ 5

  II. THE COMPLAINT DOES NOT ADEQUATELY ALLEGE ACTUAL MALICE ............. 7

    A.  Mr. Kinsey is a "Public Official" for Purposes of Libel Law .......................................... 7

    B.  The Complaint Insufficiently Alleges Actual Malice ...................................................... 9

CONCLUSION ............................................................................................................................. 11

# TABLE OF AUTHORITIES

**Cases**

*Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013) ............................................................... 3

*Application of Am. Tobacco Co.*, 880 F.2d 1520 (2d Cir. 1989).. .................................................. 3

*AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266 (2d Cir. 1992) ....................................................... 3, 4

*Barricade Books, Inc. v. Langberg*, 2000 WL 1863764 (S.D.N.Y. Dec. 19, 2000) ....................... 4

*Catalanello v. Kramer*, 18 F. Supp. 3d 504 (S.D.N.Y. 2014) ......................................................... 5

*Davis v. Costa-Gavras*, 580 F. Supp. 1082 (S.D.N.Y. 1984) ..................................................... 3, 5

*Don King Prods., Inc. v. Douglas,* 131 F.R.D. 421 (S.D.N.Y. 1990) ............................................. 3

*Dowd v. Calabrese*, 589 F. Supp. 1206 (D.D.C. 1984) .................................................................. 6

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .......................................................................... 9

*Harper v. Walters*, 822 F. Supp. 817 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994) ............ 6

*Horne v. WTVR, LLC*, 893 F.3d 201 (4th Cir. 2018) ..................................................................... 8

*Hunt v. Nuth*, 57 F.3d 1327 (4th Cir. 1995) ................................................................................... 8

*Johnson v. Johnson Publ'g Co.*, 271 A.2d 696 (D.C. 1970) .......................................................... 6

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) .................................... 6

*Nelson v. Globe Int'l, Inc.*, 626 F. Supp. 969 (S.D.N.Y. 1986) .................................................. 8, 9

*Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519 (1994) ......................................................... 3, 4

*Piscatelli v. Van Smith*, 35 A.3d 1140 (Md. 2012) ........................................................................ 6

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ......................................................................................... 7

*Skyline Travel, Inc. v. Skylink Travel, Inc.*, 2009 WL 1119418 (S.D.N.Y. Apr. 23, 2009) ............ 7

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ................................................................................ 7

*Stephens v. Am. Home Assurance Co.*, 1995 WL 230333 (S.D.N.Y. April 17, 1995) ................... 4

*United States v. Hammer*, 564 F.3d 628 (3rd Cir. 2009) .................................................................. 8

*United States v. Lee*, 274 F.3d 485 (8th Cir. 2001) ......................................................................... 8

*Weinstein v. Friedman*, 1996 WL 137313 (S.D.N.Y. Mar. 26, 1996) (same), *aff'd*, 112 F.3d 507

   (2d Cir. 1996) .................................................................................................................... 5

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ............................................... 6

*Winter v. Holmes*, 22 N.Y.3d 300 (2013) ................................................................................ 4, 5

## Other Authorities

Department of Justice, *Justice Manual* (2018) ................................................................................ 8

Fed. R. Evid. 501 ........................................................................................................................ 3

Restatement (Second) of Torts (1977) ........................................................................................... 6

The New York Times Company ("The Times") respectfully submits this reply memorandum of law in further support of its motion to dismiss the First Amended Complaint.

## PRELIMINARY STATEMENT

The crux of the claim by Plaintiff Gwynn X. Kinsey, Jr., is this: Times reporter Katie Benner knew that the young administrative assistant who was publicly groped in a barroom by Mr. Kinsey – a married man nearly twice her age, a veteran Justice Department lawyer, and a supervisor in her unit – actually *wanted* to be treated that way, and therefore Ms. Benner acted with actual malice in quoting from the sworn declaration of an eyewitness who said the groping was unwelcome and in failing to do additional reporting. Dkt. 11, First Amended Complaint ("Am. Compl.") ¶ 15. For her part, the young woman told Ms. Benner: "I have always wanted to pursue a career with the Department of Justice, but it failed me when I reported misconduct. No woman should feel compelled to deal with the pervasive harassment that I experienced, much less have her complaint be effectively disregarded." *Id.* Ex. 2.

Mr. Kinsey alleges that he was libeled when Ms. Benner quoted from the eyewitness declaration, filed in a federal civil case by a law school intern, Luke Woolman, who spoke up about Mr. Kinsey's misbehavior. *Id.* Ex.5. Mr. Kinsey's claim is as preposterous as it sounds.

More specifically, Mr. Kinsey's opposition to The Times's motion to dismiss fails for two reasons. First, New York law's fair report privilege applies and provides an absolute defense to quoting a court document like Mr. Woolman's declaration. Second, Mr. Kinsey, a veteran DOJ official who was praised for his leadership and innovation by Attorney General Eric Holder and served as counsel of record in a string of important capital cases for the Government, is a "public official" who must prove that The Times acted with actual malice. His Amended Complaint fails to lay out a plausible case that The Times did so. His own pleadings show that

1

The Times's reporter diligently sought the truth through interviews, review of court records, and outreaches to Mr. Kinsey's attorney, who served as his press spokesman.

## ARGUMENT

### I.
### THE FAIR REPORT PRIVILEGE
### DEFEATS MR. KINSEY'S LIBEL CLAIM

**A.     New York Law Provides an Absolute Privilege to The Times**

As set forth in The Times's opening memorandum of law, New York law provides an absolute defense to publishers who provide a fair and accurate account of court records. *See* Dkt. 13, Defendant's Memorandum ("NYT Br.") at 10-13.

Mr. Kinsey grasps at straws in challenging invocation of the New York privilege. He cites two New York cases that stand for the unexceptional proposition that a news article needs to make clear that statements are coming from court documents and not from interviews for the privilege to attach. *See* Dkt. 15, Plaintiff's Opposition Memorandum ("Pl. Br.") at 7. That is not an issue here. In quoting Mr. Woolman's testimony, The Times's article explicitly attributes the sentence not to any interview but to Mr. Woolman's court-filed declaration. Am. Compl. Ex. 5.

Mr. Kinsey then asserts that the privilege should not apply unless it is clearer what case the document comes from. Pl. Br. at 7-8. But he cites no law to support that proposition. And even a casual reading of the article shows that it is unambiguous in stating that the declarations cited, including Mr. Woolman's, came from the discrimination suit brought by Jacabed Rodriguez-Coss, who had worked in Mr. Kinsey's unit. *See* Am. Compl. Ex. 2 at 4. There is nothing cryptic here. The article says, "Seven men and women from the unit filed declarations in [Ms. Rodriguez-Coss's] support" in her lawsuit. *Id.* It then goes on to talk about what the "employees said in their declarations," the "court declarations" of current and former employees,

and subsequently what Mr. Woolman "wrote in his declaration." *Id.* at 4, 6. No reasonable reader would miss the fact that The Times was discussing the declarations from the discrimination case.

### B.     New York Law Applies to the Issue of Privilege

Mr. Kinsey also argues that the law of the District of Columbia should apply to the privilege issue. Pl. Br. at 9. His choice-of-law analysis is mistaken.

In actions based on diversity jurisdiction, the existence and scope of a privilege is determined by state law. Fed. R. Evid. 501; *Application of Am. Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir. 1989); *Don King Prods., Inc. v. Douglas,* 131 F.R.D. 421, 423 (S.D.N.Y. 1990). The court is to apply the choice-of-law rules of the state in which it sits to determine which state's law applies. *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 269-70 (2d Cir. 1992).

While defamation actions are often governed by the law of the plaintiff's domicile, in multistate cases it is not always apparent which state has the greatest interest, and the applicable state law may vary from issue to issue within a single libel litigation. *Adelson v. Harris*, 973 F. Supp. 2d 467, 476-78 (S.D.N.Y. 2013). "Thus, in cases where an allegedly defamatory statement is published nationally, there is only a 'presumptive' rule that the law of plaintiff's domicile applies, which 'does not hold true ... if with respect to the particular issue, some other state has a more significant relationship to the issue or the parties.' " *Id.* at 477 (quoting *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984)) (other internal marks omitted).

That principle applies in respect to privilege. New York cases have recognized that publishers or speakers invoking a privilege should be able to rely on their local law's protection of their speech rights – those that shaped their conduct at the time of publication. In weighing the interests of the competing jurisdictions in the choice-of-law analysis, courts are directed under to focus first on whether "the purpose of the law is to regulate conduct or allocate loss."

*Lilarn Properties Corp.*, 84 N.Y.2d 519, 521 (1994). The purpose of a privilege falls into the first category: conduct-regulation. *AroChem*, 968 F.2d at 270 (judicial proceeding privilege); *Stephens v. Am. Home Assurance Co.*, 1995 WL 230333, at *7 (S.D.N.Y. April 17, 1995) (reporter's privilege). And, in privilege cases, the conduct at issue is speech – whether someone will be compelled to speak or face liability for speech – making the locus of the speaker the critical factor in the choice-of-law analysis. It is the speaker who needs to be able to predict the consequences of his or her speech acts, and it is the state where the speaker is domiciled that has the greatest interest in setting the scope of the privilege, as *AroChem* demonstrates.

The issue in *AroChem* was whether a California resident could rely on California's judicial proceeding privilege in a case touching on multiple jurisdictions. The court held:

> The judicial-proceeding privilege would lose its force if weight were given to the domicile of the parties or the place of injury in determining choice of law. Were the law of some other state to be applied in the case of California's judicial-proceeding privilege, for example, the incentive of parties to California litigation to rely upon that privilege would be gravely undermined because they cannot ensure tort litigation will occur in California.

968 F.2d at 270. The same result was reached in *Barricade Books, Inc. v. Langberg*, 2000 WL 1863764 (S.D.N.Y. Dec. 19, 2000), where a lawyer from California was protected by the same California privilege. *Id.* at *7-8. Likewise, in *Stephens*, the court applied the law of the publisher's domicile, relying on similar reasoning in respect to the reporter's privilege. "New Jersey has expressed a strong interest in protecting the activities of its domiciliary news publishers through application of its privilege law." 1995 WL 230333, at *7.

The same strong interest in protecting publishers and their reliance on local law is found in New York. In *Winter v. Holmes*, 22 N.Y.3d 300 (2013), the Court of Appeals declined to enforce a Colorado criminal subpoena served on a New York reporter, even though her reporting took place in Colorado, because of New York's history of protecting journalists' right to have

4

anonymous sources and the likelihood that Colorado would not protect that right. "[A]s a New York reporter, Winter was aware of – and was entitled to rely on – the absolute protection embodied in our Shield Law when she made the promises of confidentiality that she now seeks to honor." *Id.* at 316; *see also, e.g.*, *Davis*, 580 F. Supp. at 1092 ("New York, as the national center of the publishing industry, has a significant interest in assuring that the risks and liabilities flowing from publishing . . . will be uniform."); *Weinstein v. Friedman*, 1996 WL 137313, at *8 (S.D.N.Y. Mar. 26, 1996) (same), *aff'd*, 112 F.3d 507 (2d Cir. 1996).

Here, the decision to publicize Mr. Woolman's testimony was made by The Times, a New York publisher and the sole defendant, which reasonably relied on the state's broad fair report privilege. That overarching interest dictates that New York law should apply here.

**C.      The Complaint Would Merit Dismissal Even if New York Law Did Not Apply**

If New York law did not apply, the law of Maryland, Mr. Kinsey's domicile state, would govern. Though Mr. Kinsey asserts he suffered professional harm in the District of Columbia, that harm – his demotion and move to a different division, Am. Compl. ¶ 8 – flowed from his misconduct, not the publication of the article. Mr. Kinsey points to D.C. as the location of the Capital Case Section offices (where he was not employed when the article was published) and the place of the "investigative proceedings" into his misbehavior (which were not the subject of the alleged libel), but fails to explain the legal relevance of these facts. Put simply, any interest D.C. has in this case is marginal relative to Maryland's interest in protecting its citizens from allegedly tortious conduct. *See, e.g.*, *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 512-13 (S.D.N.Y. 2014) (applying law of New Jersey, where plaintiff was domiciled, even though he claimed "reputational harm" in New York). And Maryland's privilege, like New York's, is not

overcome by actual malice. *See* NYT Br. at 10 n.6; *Piscatelli v. Van Smith*, 35 A.3d 1140, 1149 & n.3 (Md. 2012).

Mr. Kinsey argues for the application of the D.C. privilege, which he says is overcome by a showing of common-law malice (though some courts hold that a showing of actual malice is required). *See, e.g., Harper v. Walters*, 822 F. Supp. 817, 824 (D.D.C. 1993) ("The privilege also is waived if the report was published with actual malice." (citing *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 698 (D.C. 1970)), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994). In truth, the scope of D.C.'s privilege is "unsettled," *White v. Fraternal Order of Police*, 909 F.2d 512, 528 (D.C. Cir. 1990), and some D.C. decisions have found it to be absolute. *See, e.g.*, *Dowd v. Calabrese*, 589 F. Supp. 1206, 1217 (D.D.C. 1984) ("Fair and accurate accounts of official reports or records are absolutely protected from defamation actions." (citing Restatement (Second) of Torts (1977), § 611)); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1302 (D.C. Cir. 1988) ("[T]he Garment column's reference to this action is absolutely privileged as an accurate report of a judicial proceeding."). We believe these latter cases more faithfully reflect the actual law of privilege in the District of Columbia and are consistent with the widely accepted Restatement view that "the privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." Restatement § 611 cmt. a.[1]

But even if Mr. Kinsey is right, his complaint falls short of adequately pleading common-law malice. He relies almost exclusively on his attorney's statement that Ms. Benner was angry

---

[1] Indeed, though it contradicts itself, the *Harper* case noted exactly this point. 822 F. Supp. at 824 ("[The privilege] protects the publisher 'even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false.'" (quoting Restatement § 611 cmt. a)).

during a single early phone call. *See* Pl. Br. at 3, 12.[2] He fails to mention, as shown in the exhibits he filed, that Ms. Benner convincingly refuted that characterization the next day in communications with the attorney. *See* Am. Compl. Ex. 1. In fact, the two proceeded to carry on productive and professional communications, and – telling of a lack of ill will – The Times incorporated into its article the rebuttal the attorney gave on his client's behalf. *Id.* Ex. 2 at 8. Mr. Kinsey then tries to use his allegations of constitutional actual malice as proof of common-law malice. *See* Pl. Br. at 12-13. But actual malice goes to the publisher's state of mind about the truth, not about the plaintiff. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (actual malice shown by finding that defendant knew publication was false or entertained serious doubts about its truth). A hate-filled publisher can carefully pursue the truth; a congenial one can print obvious falsehoods. There is, in other words, no plausible allegation of common-law malice.[3]

## II.
## THE COMPLAINT DOES NOT ADEQUATELY ALLEGE ACTUAL MALICE

**A.     Mr. Kinsey is a "Public Official" for Purposes of Libel Law**

As the Supreme Court said in *Rosenblatt v. Baer*, 383 U.S. 75 (1966), "Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the New York Times malice standards apply." *Id.* at 86; *see* NYT Br. at 17-18.

---

[2] Neither Mr. Kinsey nor his attorney has explained how they intend to address the "advocate witness rule" and the clear conflict presented here where litigation counsel was a major player in the underlying events and will ultimately provide key testimony regarding them, should the case proceed to discovery. *See, e.g.*, *Skyline Travel, Inc. v. Skylink Travel, Inc.*, 2009 WL 1119418, at *2 (S.D.N.Y. Apr. 23, 2009).

[3] As explained below and in The Times's initial brief, there is also no plausible allegation of *constitutional* malice. The Court therefore need not resolve the question of what evidentiary showing, if any, can overcome the privilege under D.C. law.

7

As much as Mr. Kinsey tries to shrink himself and his career, it does not work. Mr. Kinsey was the deputy in the DOJ unit charged with supporting the federal government's most serious criminal prosecutions, those involving the death penalty. But there is more. Attorney General Eric Holder in 2013 described in detail the expansive and important role that Mr. Kinsey played across DOJ when Mr. Kinsey was presented with a John Marshall Award:

> The John Marshall Award for Support of Litigation is presented to the Deputy Chief of the Capital Case Section of the Criminal Division, Gwynn "Charlie" Kinsey, for his exceptional contributions to pursuing capital punishment in the most significant violent crime cases handled by department prosecutors. With more than 22 years of experience in capital matters, his holistic approach to providing guidance to federal prosecutors requires extraordinary commitment and persistence. While being asked over the past two years to significantly increase the amount of litigation-related guidance he provides to federal prosecutors, Kinsey also continues to shoulder his policy and protocol review responsibilities on behalf of the department. His work has substantially contributed to the strong partnership between the Criminal Division and the United States Attorney's Offices, and the result of this collaboration has been the successful prosecution of numerous significant violent crime cases.[4]

It is impossible to read Mr. Holder's statement and not see that Mr. Kinsey has been a leader in charting the DOJ's strategy in the country's highest-profile – and most controversial – prosecutions. He was himself counsel of record in several federal cases involving the death penalty. *See, e.g., United States v. Hammer*, 564 F.3d 628 (3rd Cir. 2009); *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001); *Hunt v. Nuth*, 57 F.3d 1327 (4th Cir. 1995).

The hollowness of Mr. Kinsey's argument is demonstrated by his attempt to equate himself with the plaintiff in *Nelson v. Globe Int'l, Inc.*, 626 F. Supp. 969 (S.D.N.Y. 1986). Pl. Br. at 13-15. Mr. Kinsey repeatedly cites the case but fails to explain who the plaintiff was. Unlike Mr. Kinsey, an award-winning leader at the DOJ, "Diane Nelson, of the Bureau of Nutrition, in

---

[4] Department of Justice, *In 61st Year of DOJ Awards Program, Attorney General Holder Recognizes Department Employees and Others for Their Service* (Nov. 25, 2013), http://bit.ly/2ZhAqun.

New York, was instrumental in preparing this marshmallow-based diet to help GLOBE readers lose up to a pound a day." *Id.* at 971. That was the sole sentence Ms. Nelson sued over. *Id.*

While Mr. Kinsey makes much of DOJ's media contact policy (Pl. Br. at 15-16), it applies to disclosure of "non-public, sensitive information obtained in connection with work," Department of Justice, *Justice Manual* (2018), 1-7.100, http://bit.ly/2XrMuaL – which had no bearing on his ability to talk about his sex acts in a barroom. But, in any event, "[a]ccess to the media is only one factor courts can consider . . . and is not dispositive of the question." *Horne v. WTVR, LLC*, 893 F.3d 201, 209 n.3 (4th Cir. 2018). In the seminal case on this issue, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court addressed what really mattered: the "compelling normative consideration underlying the distinction between public and private defamation plaintiffs." *Id.* at 344. *Gertz* applied the label of "public official" to those who take leadership roles in government and must therefore expect scrutiny of their "fitness for office [including] personal attributes." *Id.* at 344-45. As an innovator in death penalty prosecutions, Mr. Kinsey was precisely that.

**B.     The Complaint Insufficiently Alleges Actual Malice**

Mr. Kinsey's actual malice argument is straightforward: Ms. Benner had no basis for quoting Mr. Woolman's declaration testimony because she knew that the young woman wanted to be groped in the barroom by a married superior in front of her work colleagues, based on her communications with Mr. Kinsey's attorney/representative. Pl. Br. at 17-22. The speciousness of that assertion is made clear by Mr. Kinsey's filings in this case. To this day, Mr. Kinsey and his attorney still do not say what evidence exists that would have led Ms. Benner to know that the administrative assistant wanted to be pawed by him. *See*, *e.g.*, Pl. Br. at 20 (alluding vaguely to "specific information" that The Times "likely would have obtained").

9

Instead, the Amended Complaint and its exhibits establish that Ms. Benner pursued the facts with diligence and a regard for the truth. The information that she sought out and collected gave her every reason to believe that Mr. Woolman's declaration was worthy of quoting. Among other things, as the complaint and its exhibits show: (a) Mr. Woolman had made the statement unambiguously in a sworn statement filed in a federal lawsuit, (b) the administrative assistant herself asserted she was the victim of "misconduct," (c) attorneys in Mr. Kinsey's unit were told by the victim that the groping was unwelcome and those attorneys reported the misconduct to superiors at DOJ, and (d) Mr. Kinsey had been removed from his job and demoted. Ms. Benner also pursued Mr. Kinsey's side of the story and, despite getting only lawyerly double-talk and evasion (*see* Am. Compl. Ex. 1), The Times's article nonetheless reported that an inquiry had made a favorable finding for Mr. Kinsey.[5] Mr. Kinsey's remaining allegations are not probative of actual malice, for reasons already explained by The Times. *See* NYT Br. at 20-23.

---

[5] Mr. Kinsey's remark that The Times did not "bother[]" to file a Freedom of Information Act request are particularly misdirected. Pl. Br. at 20. It *did* file such a request with the Merit Systems Protection Board, further underlining its diligent efforts to get at the truth. *See MSPB FY18 FOIA Log*, *Quarter 3*, http://bit.ly/2Xfger1.

10

**CONCLUSION**

For all the reasons set forth above and in The Times's moving memorandum of law, The Times respectfully requests that the Court dismiss the Amended Complaint with prejudice under Rule 12(b)(6) and grant such other and further relief as the Court deems just and proper.

Dated: New York, NY
April 19, 2019

Respectfully submitted,

/s/ David E. McCraw
David E. McCraw, Esq.
Al-Amyn Sumar, Esq.
The New York Times Company
Legal Department
620 Eighth Avenue, 18th Floor
New York, NY 10018
Phone: (212) 556-4031
Fax: (212) 556-4634
Email: mccraw@nytimes.com

*Attorneys for Defendant*
*The New York Times Company*