UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                               :

GWYNN X. KINSEY, JR.,             :
                               :

               Plaintiff,    :

                               :

       - against -         :

                               :

THE NEW YORK TIMES COMPANY,   :
                               :

             Defendant.   :

                               :

---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/23/2020___

18-CV-12345 (VSB)

**OPINION & ORDER**

Appearances:

Barry Coburn
Coburn & Greenbaum PLLC
Washington, D.C.
*Counsel for Plaintiff*

David Edward McCraw
The New York Times Company
New York, NY
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff Gwynn X. Kinsey, Jr., brings this defamation suit against Defendant The New York Times Company, alleging that he was defamed by Defendant's March 31, 2018 publication of an article entitled *At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted Groping*. Before me is Defendant The New York Times Company's motion to dismiss Plaintiff's First Amended Complaint. (Doc. 12.) Because the alleged defamatory statement at issue in Defendant's article is protected under New York's Fair Report Doctrine, Defendant's motion to dismiss is GRANTED.

I.      **Factual Background**[1]

From September of 1998 to October of 2017, Plaintiff Gwynn X. Kinsey, Jr. ("Plaintiff")

was an attorney in the Capital Case Section ("CCS") of the Criminal Division of the United

States Department of Justice, located in Washington, D.C.  (FAC ¶ 8.)  In 2001, Plaintiff was

promoted to the position of Deputy Chief of the CCS, which was then called the Capital Case

Unit.  (*Id.*)  In 2016, Plaintiff became Principal Deputy Chief of CCS, but on October 31, 2017,

he was reassigned to the Office of Enforcement Operations in the Criminal Division, following a

May 24, 2017 incident with an intern.  (*Id.*)

In November of 2015, Alyssa tenBroek became employed as an intern in the CCS.  (*Id.* ¶

9.)  Initially, from November of 2015 through June of 2016, tenBroek reported to Plaintiff.

Subsequently, beginning in July of 2016, tenBroek reported to another deputy chief of the CCS.

On May 24, 2017, a CCS "happy hour" took place at Proper 21, a bar in the District of

Columbia.  (*Id.* ¶ 10.)  In attendance were tenBroek, Plaintiff, and a number of their CCS

colleagues.  (*Id.*)  During the course of this evening, at the bar and elsewhere, Plaintiff and

tenBroek had interactions of a sexual nature.  (*Id.*)

On April 21, 2016, Jacabed Rodriguez-Coss, a former prosecutor in the CCS, filed a

gender discrimination suit against the Department of Justice.[2]  In connection with a summary

---

[1] The facts set forth in this section are derived from Plaintiff's First Amended Complaint ("FAC") and its accompanying exhibits.  (Doc. 11.)  I assume the allegations set forth in the First Amended Complaint and its accompanying exhibits to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[A] complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *see* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").  My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] *Rodriguez-Coss v. Lynch*, 16-cv-00633-VLB (D. Conn. Apr. 5, 2016), ECF No. 1.  I take judicial notice of the docket sheet in the *Rodriguez-Coss v. Lynch* case for purposes of this opinion.  *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings." (citation omitted)).  Rodriguez-Coss's case was dismissed on summary judgement,

judgment motion in that case, multiple declarations written by CCS employees were filed.  *See Rodriguez-Coss*, 16-cv-00633-VLB, ECF No. 46.  Certain of the declarations contained information about alleged gender discrimination in the CCS.  One such declaration—the Woolman Declaration—is signed by a 2017 intern of CCS and stated that during the May 24, 2017 happy hour at Proper 21, "[Plaintiff] drank heavily," and further stated that "[Plaintiff], who is a married man, began to take what seemed very clearly to be unwelcome liberties of a physical, sexual nature with a [CCS] staffer, who, to preserve her privacy, [is referred] to only as A.T."  (Woolman Decl. ¶ 6.)[3]  Plaintiff states in his First Amended Complaint that the A.T. referred to in the Woolman Declaration is Alyssa tenBroek, the CCS employee with whom he had sexual interactions.  (FAC ¶ 13.)

In early March of 2018, Plaintiff's counsel was contacted by Katie Benner, a New York Times reporter.  (*Id.* ¶ 11.)  The two spoke by phone and exchanged emails.  (*Id.*; *see also id.* Ex. 1.)[4]  The email exchange between Benner and Plaintiff's counsel discussed details about a forthcoming article being written by Benner, the article giving rise to the instant suit.  (Ex. 1.)  In the email exchange, Plaintiff's counsel accuses Benner of drafting an article with "pejorative information about a long-time lawyer in public service . . . , based on one document in a court file," and stated that "there is substantial contrary information that has been elicited" and that Plaintiff's counsel "would love to be able to provide . . . more specificity and to go on the

---

*see Rodriguez-Coss v. Sessions*, No. 3:16-CV-00633-VLB, 2018 WL 3213290 (D. Conn. June 29, 2018), which the Second Circuit affirmed, *see Rodriguez-Coss v. Barr*, 776 F. App'x 717 (2d Cir. 2019).

[3] "Woolman Decl." refers to the Declaration of Luke Woolman, which is appended to the First Amended Complaint as Exhibit 5, (Doc. 11-5).  The Woolman Declaration was initially filed as an exhibit to Jacabed Rodriguez-Coss's memorandum in opposition to defendant's motion for summary judgment.  *Rodriguez-Coss v. Lynch*, 16-cv-00633-VLB (D. Conn. Apr. 5, 2016), ECF No. 46-12.

[4] "Ex. 1" refers to the email exchange between Katie Brenner and Plaintiff's counsel Barry Coburn, dated from March 4, 2018 to March 6, 2018, and filed as Exhibit 1 to the First Amended Complaint.  (Doc. 11 Ex. 1.)

record," but that "[he was] governed by [] constraints." (Ex. 1, at 2–3.) Benner replied to

Plaintiff's counsel's email stating:

> The story is not based on a single court filing. I'm sorry that you have that
> impression. It's based on the case, as well as interviews and other documents. The
> main allegations, which I've shared with you, are all included in that court filing,
> so there will be no surprises in the story.

(*Id.* at 2.)

On March 31, 2018, the New York Times published Katie Benner's article entitled *At the

Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias and Unwanted

Groping* (the "Article" or "Art.").[5] The Article states that during a "work-sanctioned happy hour

at a restaurant near the Justice Department, colleagues watched [Plaintiff] grope the

administrative assistant, Alyssa tenBroek." (Art. 7.) The Article references a complaint that

Rodriguez-Coss filed with the Equal Employment Opportunity Commission ("EEOC"), and

states that she sued the Department of Justice in 2016, accusing her supervisor of gender

discrimination. (Art. 4.) The Article includes passages from the declarations filed in the lawsuit,

and states the following when discussing the Woolman Declaration:

> The years of warnings that their bosses had ignored or condoned misconduct came
> to a head last May. During a work-sanctioned happy hour at a restaurant near the
> Justice Department, colleagues watched Mr. Kinsey grope the administrative
> assistant, Alyssa tenBroek.

> "Mr. Kinsey, who is a married man, began to take what seemed very clearly to be
> unwelcome liberties of a physical, sexual nature," Luke Woolman, an intern at the
> time, wrote in his declaration. He said Mr. Kinsey repeatedly touched Ms.
> tenBroek, whom he identified as A.T., "inappropriately, openly and obviously" in
> front of patrons, Mr. Carwile and at least one other Justice Department prosecutor.

---

[5] The published online version of the Article is attached to Plaintiff's First Amended Complaint as Exhibits 2 and 4,
(Doc. 11 Exs. 2, 4). A print copy of the Article, which appeared on page A1 of the New York edition of the New
York Times on April 1, 2018 with the headline *Years of Claims of Harassment in Justice Dept.*, is attached to
Plaintiff's First Amended Complaint as Exhibit 3, (Doc. 11 Ex. 3). Throughout this opinion, I will cite to Exhibit 4
when citing the Article, which includes the full imaging and substance of the online article. The Article can also be
found online at https://www.nytimes.com/2018/03/31/us/politics/justice-department-harassment-bias.html.

(Art. 7.)[6]

## II.    **Procedural History**

Plaintiff filed the Complaint in this action on January 2, 2019.  (Doc. 2.)[7]  After

Defendant filed a motion to dismiss the Complaint on February 7, 2019, (Doc. 6), Plaintiff filed a

First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), (Doc. 11

("FAC")).  The First Amended Complaint included seven exhibits.  Defendant filed the instant

motion to dismiss the amended complaint on March 7, 2019, supported by a memorandum of

law.  (Docs. 12, 13.)  Plaintiff filed a memorandum of law in opposition to Defendant's motion

to dismiss on April 8, 2019, (Doc. 15), and Defendant filed a reply memorandum of law on April

19, 2019, (Doc. 18).

On August 26, 2019, Plaintiff filed a letter of supplemental authority regarding the

Second Circuit's decision in *Palin v. New York Times Co.*, 933 F.3d 160 (2d Cir. 2019).  (Doc.

20.)  Defendant filed a response to that letter on the same day.  (Doc. 21.)  Finally, on October

17, 2019, Plaintiff filed an additional letter of supplemental authority regarding the *Palin* case

after the Second Circuit published an amended and superseding opinion, *Palin v. New York*

*Times Co.*, 940 F.3d 804 (2d Cir. 2019).  (Doc. 22.)  Defendant filed a response on October 20,

---

[6] An image of paragraphs 7 and 8 of the Woolman Declaration appears in the online version of the Article with the following caption:  "A portion of the declaration of Luke Woolman, an intern at the time in the death penalty division."  (Art. 8.)  These paragraphs state the following:

> 7. Mr. Kinsey repeatedly touched A.T. inappropriately, openly and obviously, in the presence of Proper 21 patrons, as well as Mr. Carwile and at least one Capital Case Section attorney who was still present and seated nearby.  Mr. Carwile did not chide, warn or request that Mr. Kinsey desist in any way, although, as stated, what was occurring was obvious and inappropriate.

> 8. Instead, at the end of the evening, Mr. Carwile approached me and asked me not to discuss anything that I witnessed.  I initially laughed because I presumed Mr. Carwile was joking, but then he sternly reiterated his request, specifically stating that he was being serious.

(*Id.*)

[7] Plaintiff originally filed the complaint on December 29, 2018, (Doc. 1), but the Clerk of Court deemed the filing deficient.

2019.  (Doc. 23.)

### III.   **The Alleged Defamatory Statement**

Plaintiff alleges that "the defamatory falsehood in question is the contention, in the 'Woolman Declaration' . . . , that the physical contact between [Plaintiff] and [tenBroek] was 'unwelcome,'" a statement which the Article references using quotation marks.  (FAC ¶ 6; *see also* Art. 7 ("'Mr. Kinsey, who is a married man, began to take what seemed very clearly to be unwelcome liberties of a physical, sexual nature,' Luke Woolman, an intern at the time, wrote in his declaration." (quoting the Woolman Declaration).)

### IV.   **Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id*.  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  The plausibility standard applies equally in a defamation case requiring allegations of actual malice.  *Biro v. Conde Nast*, 807 F.3d 541, 545

(2d Cir. 2015) (concluding that "malice must be alleged plausibly in accordance with Rule 8");

Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be

alleged generally.").

In considering a motion to dismiss, a court must accept as true all well-pleaded facts

alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.

*Kassner*, 496 F.3d at 237.  "A complaint is deemed to include any written instrument attached to

it as an exhibit or any statements or documents incorporated in it by reference."  *Nicosia v.*

*Amazon.com, Inc*., 834 F.3d 220, 230 (2d Cir. 2016) (internal quotation marks omitted); *see also*

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, No. 06 CV 11407 (BSJ), 2007 WL

4820968, at *5 n.7 (S.D.N.Y. Sept. 18, 2007) (stating that a court can consider the alleged

defamatory article attached to the complaint on a motion to dismiss).  A court "may also consider

matters of which judicial notice may be taken" in ruling on a motion to dismiss, *Staehr v.*

*Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008), including docket sheets,

*Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).  *See also Global Network*

*Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take

judicial notice of a document filed in another court not for the truth of the matters asserted in the

other litigation but rather to establish the fact of such litigation and related filings." (citation

omitted)).  Finally, although all allegations contained in the complaint are assumed to be true,

this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.

V.   <u>**Choice of Law**</u>

A.   ***Applicable Law***

As a threshold matter, I must determine which state's substantive law applies to this

defamation action.  Federal courts sitting in diversity apply the choice of law rules of the forum

state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941).  Under New York

choice of law rules, the first step is to "determine whether there is an actual conflict between the

laws of the jurisdictions involved."  *In re Allstate Ins. Co. (Stolarz),* 81 N.Y.2d 219, 223 (1993).

The Court need not "embark on a choice-of-law analysis in the absence of an 'actual conflict'

between the applicable rules of two relevant jurisdictions."  *Fin. One Pub. Co. v. Lehman Bros.*

*Special Fin*., 414 F.3d 325, 331 (2d Cir. 2005).  Here, the authorities cited by the parties suggest

that New York's absolute privilege under the Fair Report Doctrine conflicts with the District of

Columbia's ("D.C.") qualified privilege.[8]  *Compare Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504,

520 (S.D.N.Y. 2013) ("The fair and true report privilege has been described as an absolute

privilege that is not defeated by the presence of malice or bad faith." (quoting *Biro v. Condé*

*Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012)); *with Oparaugo v. Watts*, 884 A.2d 63, 81

(D.C. 2005) ("The [fair reporting] privilege is a qualified one.  Therefore, it can be defeated by

the presence of malice." (internal citations omitted)).  Accordingly, I conduct a choice of law

analysis.  *Cf. Test Masters Educ. Servs., Inc.*, 2007 WL 4820968, at \*3 (conducting a choice of

law analysis because New York's absolute privilege under the Fair Report Doctrine conflicted

with Texas' qualified privilege).

  "In tort cases like this, New York applies the law of the state with the most significant

interest in the litigation."  *Lee v. Bankers Tr. Co*., 166 F.3d 540, 545 (2d Cir. 1999) (citing

*Padula v. Lilarn Props. Corp*., 84 N.Y.2d 519, 521 (1994)).  In cases where a defamatory

---

[8] I note that in its opening memorandum of law Defendant argues that I need not choose among the possible relevant jurisdictions "because the substantive laws of the possibly relevant jurisdictions are not in conflict."  (Memorandum of Law in Support of Motion to Dismiss Amended Complaint by Defendant The New York Times Company ("Def. Mem.") at 10 n.6.)  Plaintiff in his opposition asserts that the choice of law rules dictate that I should apply D.C. law.  (Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss First Amended Complaint ("Opp. Mem") at 6–9.)  In its reply memorandum of law, Defendant argues that Plaintiff's "choice-of-law analysis is mistaken" and that I should apply New York law.  (Reply Memorandum of Law in Further Support of Motion to Dismiss Amended Complaint by Defendant The New York Times Company ("Reply Mem.") at 3–5.)

statement is published nationally, "the state of most significant relationship is usually the state where the plaintiff was domiciled at the time" the defamatory statement was published. *Davis v. Costa–Gavras,* 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984) (quoting Restatement (Second) of Conflict of Laws § 150(2) (1977)). "This presumptive choice of law does not hold true, however, if 'with respect to the particular issue, some other state has a more significant relationship to the issue or the parties.'" *Id.* (quoting Restatement (Second) of Conflict of Laws § 150 cmt. (e) (1977)); *see also La Luna Enterprises, Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999) ("Although the preference for the plaintiff's domicile is not conclusive, the significant contacts [in a defamation case] are, almost exclusively, the parties' domiciles and the locus of the tort." (citation omitted)). In making this determination, courts consider "where the plaintiff suffered the greatest injury, where the statements emanated from and were broadcast, where the activities to which the allegedly defamatory statements refer took place and the policy interests of the states whose laws might apply." *Cabello-Rondón v. Dow Jones & Co., Inc.*, No. 16-CV-3346 (KBF), 2017 WL 3531551, at *3 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d Cir. 2018).[9]

## B.   *Application*

In this case, Plaintiff acknowledges that he is "domiciled in the State of Maryland," and that Defendant is a "corporation domiciled in the State of New York." (FAC ¶¶ 2–3.) Plaintiff

---

[9] Other courts in this district have applied a nine-factor test to determine choice of law in libel cases. *See Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1318 (S.D.N.Y. 1988) (considering "(1) the state of the plaintiff's domicile; (2) the state of plaintiff's princip[a]l activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (7) the state of emanation; (8) the state where the libel was first seen; and (9) the law of the forum"). Here, I find that factors four through nine favor application of New York law, with factor two favoring application of D.C. law and factor one favoring Maryland law. Further, I find that factor three could favor application of either Maryland or D.C. law given the facts of this case. However, I would reach the same choice of law conclusion as I do here had I used this nine-factor test, and do "not find that approach to be substantively different than the inquiry undertaken" in my choice of law analysis. *Test Masters Educ. Servs., Inc.*, 2007 WL 4820968, at *4 n.5.

also states that "a substantial part of the acts and omissions complained of [in the First Amended Complaint] occurred in [the Southern District of New York]," (*id.* ¶ 5), and that Defendant's "front-page story [was] published in every state of the United States and all over the world," (*id.* ¶ 7). Plaintiff argues for the application of D.C. law on the basis that the alleged defamatory statement in the Article refers to actions that took place in D.C., (Opp. Mem at 6–9), while Defendant argues that New York law should apply, (Reply Mem. at 3–5). Based on the parties' domiciles, the policy interests involved, and the fact that Plaintiff chose to file this action in New York, I find that New York has the most significant interest in this litigation, and apply New York defamation law.

First, although Plaintiff worked in D.C., New York's choice of law rules "presume[] [a] relationship between domicile and injury," *Test Masters Educ. Servs., Inc.*, 2007 WL 4820968, at *4, thus making it likely that the greatest injury suffered by Plaintiff from this alleged defamation occurred in Maryland. This is particularly true given Plaintiff's assertion that the defamatory statement in question was published worldwide and not in a specific location. (*See* FAC ¶ 7.) Although the First Amended Complaint states that on October 31, 2017, Plaintiff was reassigned in D.C. following the May 24, 2017 incident with the intern, (*id.* ¶ 8), Plaintiff was reassigned prior to the publication of the Article, and I therefore find that Plaintiff was reassigned due to the incident itself or for some other reason, but not the alleged defamatory statement. Second, the defamatory statement in question emanated from New York based on its publication in the New York Times. *Machleder v. Diaz*, 801 F.2d 46, 52 (2d Cir. 1986) ("CBS accurately asserts that New York has a strong interest in this litigation, because WCBS–TV is located there, the subject broadcast emanated in Manhattan, and the day-to-day professional activities of CBS are conducted in New York."); *Cabello-Rondón*, 2017 WL 3531551, at *1, 3

(concluding that statements made by Dow Jones published in the Wall Street Journal emanated from New York); *Test Masters Educ. Servs., Inc.*, 2007 WL 4820968, at *5 ("[T]he allegedly defamatory article emanated from New York via its publication in the [New York] Post."). Third, the allegedly defamatory statement refers to actions that took place in D.C., specifically, the May 24, 2017 happy hour incident at Proper 21.  And finally, although both Maryland and New York have policy interests in this suit, I find that New York's policy interest is greater. While Maryland has an interest in protecting its citizens from defamation, *see, e.g.*, *Machleder*, 801 F.2d at 52 (recognizing a state's interest in protecting its citizens from defamation), New York has a strong interest in establishing defamation standards for media outlets domiciled in the state, *id.* (recognizing New York's interest "in establishing a standard of fault for its news media"); *Test Masters Educ. Servs., Inc.*, 2007 WL 4820968, at *5 ("New York has a policy interest in regulating the conduct of the media, including the Post, whose principal place of business is in New York." (internal citation omitted)); *Condit v. Dunne*, 317 F. Supp. 2d 344, 355 (S.D.N.Y. 2004) ("New York extends greater protection to the media and to opinions than do[] other jurisdictions, and has an interest in this case in having its defamation laws applied to defendant").  Additionally, Plaintiff filed suit in New York.  I therefore find, on balance, that these factors support the application of New York law.  *See Costa-Gavras*, 580 F. Supp. at 1093 ("In a multistate libel case such as this, where the plaintiffs are public servants from different jurisdictions and the alleged damage to their reputations is diffused over fifty states and several foreign nations, the state where defendants' significant acts and omissions gave rise to their liability is the most appropriate source of legal norms, particularly when it is also the forum state.").

With regard to Maryland, in cases where courts have applied the law of a plaintiff's

domicile over the law of the state in which a publishing defendant resides, there was additional evidence that the defendant appeared in the plaintiff's domicile or was reporting on activities occurring in the plaintiff's domicile.  *See, e.g.*, *Machleder*, 801 F.2d at 52 (upholding district court's determination that New Jersey's interest outweighed New York's where a New Jersey reporter working for a New York-based news organization conducted an interview in New Jersey concerning a hazardous waste site located in New Jersey that was broadcast in New Jersey and New York).  Here, however, although the New York Times interviewed Plaintiff's D.C.-based counsel, (*see* Ex. 1), Plaintiff is not domiciled in D.C.  Additionally, there is no evidence that Defendant conducted any activities in Plaintiff's domicile—Maryland—other than the circulation of the Article as part of its nationwide distribution, and the alleged defamatory statement does not concern activities in Maryland.

Finally, when a conflict of laws issue involves the application of a privilege that protects a publishing defendant from defamation liability, courts give particular weight to the policy interests of the state in which the defendant makes the alleged defamatory statement.  Here, that state is New York.  *Cf. AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269–70 (2d Cir. 1992) ("As noted, the California rule of privilege regulates conduct and, even assuming that injuries suffered by Harris and AroChem occurred in Connecticut, California's interests prevail.").

## VI.    <u>Discussion</u>

Defendant moves to dismiss Plaintiff's First Amended Complaint on the grounds that the alleged defamatory statement in the Article—the statement quoting the Woolman Declaration's assertion that Plaintiff's conduct on May 24, 2017 "seemed very clearly to be unwelcome," (Art. 6)—is absolutely privileged under New York Civil Rights Law Section 74.  I agree.

A.      *Applicable Law*

Section 74 states, in relevant part, that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding."  N.Y. Civ. Rights L. § 74.  "[T]he statute confers an absolute immunity, regardless of proof of malice or negligence, upon any person who publishes a 'fair and true report' of a judicial [proceeding]."  *Wexler v. Allegion (UK) Ltd*., 374 F. Supp. 3d 302, 311 (S.D.N.Y. 2019) (quoting *Beary v. W. Publ'g Co*., 763 F.2d 66, 68 (2d Cir. 1985)).

"A publication is deemed fair and true if it is substantially accurate."  *Tacopina v. O'Keeffe*, 645 F. App'x 7, 8 (2d Cir. 2016) (summary order) (quoting *Karedes v. Ackerley Grp. Inc.*, 423 F.3d 107, 119 (2d Cir. 2005)).  "A report is substantially accurate if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth."  *Id.* (quoting *Karedes*, 423 F.3d at 119).  "New York courts adopt a liberal interpretation of the fair and true report standard of [section] 74 so as to provide broad protection to news accounts of judicial proceedings."  *Friedman v. Bloomberg L.P*., 884 F.3d 83, 93 (2d Cir. 2017) (internal quotation marks omitted).  Accordingly, "[w]hen determining whether an article constitutes a fair and true report, the language used therein should not be dissected and analyzed with a lexicographer's precision."  *Tacopina*, 645 F. App'x at 8 (quoting *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67 (1979)). However, a fair report analysis requires the court read the challenged statements "in the context of the entire statement or publication as a whole, tested against the understanding of the average reader."  *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (N.Y. 1985).  "The contested statement must be connected to a judicial proceeding such that the ordinary viewer or reader is able to determine from the publication itself that the publication is reporting on the proceeding."  *Wexler*, 374 F.

13

Supp. 3d at 311–12 (internal quotation marks and citations omitted).  Although "a report's mere mention of an official proceeding does not automatically extend the privilege to an entire publication[,] the privilege may apply to some portions of a report and not others."  *Fine v. ESPN, Inc*., 11 F. Supp. 3d 209, 217 (N.D.N.Y. 2014).  However, "[q]uotations from, and summaries of, documents or other material that the report indicates are part of a proceeding are indisputably statements 'of' that proceeding."  *Id.* at 216–17.

"It is for the Court to determine as a matter of law if a publication is a 'fair and true' report under section 74, unless the Court determines that an issue of fact remains."  *Test Masters Educ. Servs., Inc*., 2007 WL 4820968, at *3 (citing *Karp v. Hill & Knowlton, Inc*., 631 F. Supp. 360, 363 (S.D.N.Y. 1986)).  "If there are no issues of fact and the only issue is 'whether the undisputed content of the [statement] qualifies as a 'fair and true report' of the undisputed content of [a court filing], the Court can resolve the dispute as a matter of law' on a motion to dismiss."  *Wexler*, 374 F. Supp. 3d at 312 (quoting *Abkco Music, Inc. v. William Sagan, Norton LLC*, No. 15 CIV. 4025 (ER), 2016 WL 2642224, at *4 (S.D.N.Y. May 6, 2016)).

### B.    *Application*

Plaintiff admits that the Woolman Declaration "had been filed in a civil case in the United States District Court for the District of Connecticut," and included the exact language quoted by Defendant in the Article.  (FAC ¶ 12; Doc. 15, at 4–5.)  However, Plaintiff alleges that "[t]he references in the New York Times article to the Woolman Declaration do not make clear in what proceeding it was filed, nor that it was filed, nor its significance in the context of any such judicial proceeding[,] render[ing] the Fair Report Privilege inapplicable."  (FAC ¶ 14.) This argument is meritless.

The Article introduces the judicial proceeding in question, *Rodriguez-Coss v. Lynch*, 16-

cv-00633-VLB (D. Conn. Apr. 5, 2016),[10] with the following language:

> Ms. Rodriguez-Coss filed a complaint to the E.E.O.C., which notified the Justice Department.  Mr. Carwile subsequently suspended permission for her to work from Connecticut. She sued the department in 2016, accusing [Carwile] of gender discrimination and claiming that her permission to work in Connecticut was taken away in retaliation for her complaints.
>
> Seven men and women from the unit filed declarations in her support. . . .

(Art. 4.)  The Article then quotes various statements from these declarations, eventually quoting the Woolman Declaration.  (*Id.* at 4–6.)  The quotation from the Woolman Declaration is verbatim and in quotation marks, and is followed by the statement "Luke Woolman, an intern at the time, wrote in his declaration."  (*Id.* at 6.)  The online version of the Article even includes a screenshot of several paragraphs of the Woolman Declaration with the caption "[a] portion of the declaration of Luke Woolman, an intern at the time in the death penalty division."  (Art. 8.)  Although Plaintiff's brief characterizes the substance of Defendant's article in an awkward and convoluted fashion, an average reader of the article itself would readily understand the statement in question to be a reference to the Woolman Declaration filed in Rodriguez-Coss's 2016 lawsuit against the Justice Department.  Although Plaintiff's argument relies primarily on *Fine*, that case itself recognizes that "[q]uotations from, and summaries of, documents or other material that the report indicates are part of a proceeding are indisputably statements 'of' that proceeding."  11 F. Supp. 3d at 216–17; *cf. Abkco Music, Inc.*, 2016 WL 2642224, at *3 ("It is sufficient that the plaintiff's complaint or documents referred to therein form the basis for each of the contested statements.").  Indeed, when Plaintiff's counsel himself first saw a draft version of the Article, he accused Defendant of making a defamatory statement "based on one document in a court file," (Ex. 1, at 2–3), and clearly had no trouble identifying the alleged defamatory statement as a

---

[10] The Article does not include the case citation.

statement made in a judicial proceeding.

Because Plaintiff otherwise raises no dispute as to whether the alleged defamatory statement correctly quotes the Woolman Declaration, and because Plaintiff makes clear that his suit is based solely on the statement from the Woolman Declaration that his contact with the intern appeared "unwelcome," (FAC ¶ 6), I find that the statement is a fair and accurate report protected under New York Civil Rights Law Section 74.  Accordingly, the statement is accorded absolute immunity in this defamation suit, negating Plaintiff's claim.

**VII.   <u>Conclusion</u>**

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's First Amended Complaint is GRANTED.  The Clerk of Court is directed to terminate the open motion at Document 12, and is further directed to close this case.

SO ORDERED.

Dated: March 23, 2020
       New York, New York

Vernon S. Broderick
United States District Judge